UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christopher Michael LARSEN,<br><br>                        Plaintiff,<br><br>v.<br><br>Nancy A. BERRYHILL,<br><br>                        Defendant. | Case No.: 16-cv-2847-JM-AGS<br><br>**REPORT AND RECOMMENDATION ON SUMMARY JUDGMENT MOTIONS (ECF Nos. 20 & 21)** |

"[D]eception, withholding of evidence, fraud, manipulation"—these incendiary allegations rarely appear outside of criminal indictments. (*See* ECF No. 20, at 1.) And, despite plaintiff's protests, they don't belong in this Social Security appeal either. This Court recommends affirming the decision to deny plaintiff disability benefits.

## I.

## BACKGROUND

Plaintiff Christopher Larsen applied for disability benefits to cover a 17-month period—from October 13, 2014, to March 13, 2016—when he was purportedly unable to work due to severe pain and other ailments. (*See* AR 20, 28, 67.) The Administrative Law Judge concluded that Larsen suffered from four severe impairments: "obesity, left spermatocele, major depression, and an anxiety disorder." (AR 22.) But the ALJ found that Larsen's symptoms were not as serious as he claimed and that he could engage in "unskilled, sedentary work," within certain limits. (AR 25-26, 28.) After determining that

such work was available, the ALJ concluded that Larsen was not disabled during the relevant time frame and denied his request for benefits. (AR 32.) In this appeal, Larsen asserts that his Social Security proceedings were riddled with errors.

## II.

## DISCUSSION

### A. Standard of Review

A court "may set aside a denial of benefits only if it is not supported by substantial evidence or is based on legal error." *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 929 (9th Cir. 2014) (citation omitted); *see also* 42 U.S.C. § 405(g). "Substantial evidence means more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2008) (citation omitted). The "substantial evidence" standard is even "more deferential [to the agency] than 'clearly erroneous.'" *Stern v. Marshall*, 564 U.S. 462, 515 (2011) (citation omitted); *see also Dickinson v. Zurko*, 527 U.S. 150, 152-53 (1999) (explaining that the "clearly erroneous" standard allows "somewhat closer judicial review" than the more deferential "substantial evidence" standard used for evaluating agency decisions (citations omitted)).

### B. Fraud

Larsen first takes to task the ALJ, and indeed the Social Security Administration at large, for defrauding him of Social Security benefits. The Court interprets these various claims as an argument for Larsen's due-process right to an impartial adjudicator. *See Hummel v. Heckler*, 736 F.2d 91, 93 (9th Cir. 1984) (describing right to "an unbiased judge," which is "applicable to administrative as well as judicial adjudications" (citations omitted)). To prevail, Larsen "must show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment." *Bayliss v. Barnhart*, 427 F.3d 1211, 1214-15 (9th Cir. 2005) (citation and quotation marks omitted). The Court begins "with a presumption that the ALJ was unbiased," but that presumption may be rebutted "by showing a conflict of interest or some other specific

reason for disqualification." *Id.* at 1215 (citation and quotation marks omitted). In his papers, Larsen weaves a web of institutional graft from three threads, addressed below.

### 1. *Deceptive Letterhead*

First, Larsen accuses the Administration of "using the letterhead for [Supplemental Security Income] in a purposeful act of deception with the sole purpose of deceiving me and causing me to miss my deadline for an appeal of my application for [Social Security Disability Insurance] benefits." (ECF No. 20, at 2.) In this initial rejection letter, the Administration informed Larsen in the opening paragraph that "you are not disabled" (AR 127) and ultimately advised him that he did not qualify either "for Supplemental Security Income (SSI) payments" or "for Social Security benefits." (AR 127-28.) Larsen nevertheless claims the letter was misleading because its caption does not specifically reference Social Security *Disability Insurance* and instead is titled:

SOCIAL SECURITY ADMINISTRATION
**SUPPLEMENTAL SECURITY INCOME**
Notice of Disapproved Claims

(AR 127.) If this boilerplate heading was an insidious attempt to steer Larsen into procedural default, it was poorly executed. The Administration never raised Larsen's lateness at any stage of the proceedings, and Larsen successfully obtained review before an ALJ and now this Court. At any rate, there is no evidence that the ALJ was involved in this letter or its titling. Thus, the letter's perhaps-incomplete caption is no basis for disqualifying the ALJ or the Administration.

### 2. *Scheming Psychiatrist*

Larsen argues that the Administration acted fraudulently by having him evaluated by psychiatrist Dr. Camellia Clark, who "manipulate[d], plot[ted] and scheme[d] . . . to exact revenge" against him. (ECF No. 20, at 11.) According to Larsen, Dr. Clark sprayed him with an air freshener twice, which Larsen considers an "assault and battery." (*See* AR 296-97.) Almost a month later, he reported this incident to the police, but the investigating officer recommended against charges. (AR 331.) Larsen also alleges that

Dr. Clark "perverted her authority and position of public trust to exact revenge in the cruelest, most tortuous way she could devise through her manipulation of the SSA and the [California Highway Patrol] by way of filing false, malicious reports." (AR 299.) In particular, he blames Dr. Clark for reporting that he had suicidal ideations and a firearm, which he believes led law enforcement to subject him to a mental-health-check phone call. (*See* AR 298-99, 755.) Based on these and similar grievances, Larsen later sued and filed a disciplinary complaint against Dr. Clark. (*See* AR 268-93.)

In addition to this provocative history, Larsen objects to Dr. Clark's psychiatric evaluation, which undermined his disability case. Other than the aforementioned suicidal ideations, Dr. Clark concluded that Larsen had no mental limitations and that his behavior "strongly suggests malingering." (AR 755.) But she conceded, "If in fact the claimant is telling the truth about his suicidal ideation and recent ER visit on a 5150 [involuntary psychiatric hold], he would appear to meet criteria for disability." (*Id.*)

Larsen's checkered history with this one contract psychiatrist does not prove any institutional fraud. In fact, when Larsen objected to seeing Dr. Clark for a follow-up evaluation, the Administration promptly scheduled him to see a different psychiatrist. (*See* AR 298.) As for the ALJ, he apparently had no role in the initial Dr. Clark appointment or its aftermath. Regardless, the ALJ eventually relied more heavily on the second psychiatrist, who Larsen never criticized.[1]

3. *Missing Reports*

The final strand in Larsen's proffered web of fraud is his accusation that the Administration withheld two of Dr. Clark's "reports": (1) a psychiatric evaluation, dated March 2015, relating to Larsen's ill-fated initial appointment (*see* AR 753-55); and (2) a services bill, dated April 2015, reflecting that Larsen's next appointment was "not kept," (*see* AR 757). In the initial denial letter, the Administration mentioned that both of these

---

[1] Larsen also mentions a complaint against a different physician in Dr. Clark's practice, but never explains its relevance. Thus, the Court need not address it.

4

"report(s) were used to decide your claim." (*See* AR 127.) Yet Larsen alleges that the Administration delayed disclosing the first document to him, and that he never even saw the second.

(a) *Psychiatric Evaluation*

It is very likely the Administration postponed divulging the psychiatric evaluation. An Administration employee placed this warning in the record: "ALERT- Due to the history of this claimant and CE [consultative examination] provider [Dr. Clark's office] . . . claimant should NOT be provided a copy of this CE report as it could have an adverse effect." (AR 237.) Still, Larsen's attorney obtained a copy of it because he urged the ALJ to disregard "the findings and opinions expressed by Camellia Clark, Ph.D., in Exhibit 6F [Dr. Clark's psychiatric evaluation]." (See AR 294, 753-55.)

At any rate, Dr. Clark's psychiatric report had virtually no impact on the ALJ's ultimate decision. The ALJ only mentions it four times. One citation actually *helped* Larsen's disability cause. In discussing the mental status examinations, the ALJ noted that Larsen's four Global Assessment of Functioning scores ranged from 50 ("[s]erious symptoms") to 65 ("mild symptoms"). *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (defining GAF ranges); (AR 29). The only score in the serious range was recorded by Dr. Clark. (*See* AR 29, 755.) Two other references to the psychiatric evaluation were entirely inconsequential. (*See* AR 28 (acknowledging Larsen's request that he not consider Dr. Clark's report); AR 29 (noting that both "Dr. Clark and Dr. Nicholson indicated that the claimant retained the capacity to understand simple instructions," which Larsen does not dispute).) Finally, the ALJ cited this report in addressing Larsen's possible malingering (AR 30), which was at worst harmless error. (*See* Section II.C.1.(e) below.)

By contrast, the ALJ mentioned the name or findings of the other psychiatrist— Dr. Nicholson—15 times. (*See* AR 23-30.) Unlike Dr. Clark, who found no limitations outside of the suicidal ideation, Dr. Nicholson believed Larsen had "mild functional limitations." (AR 30.) The ALJ explicitly gave this opinion "some weight" (AR 30), whereas he never explicitly afforded Dr. Clark's opinion any weight. In short, Larsen had

5

access to Dr. Clark's psychiatric evaluation in time for his disability hearing, and it did not affect the proceedings' outcome.

(b) *Services Bill*

As for the services bill, Larsen may believe he never saw that "report," because it hardly merits the label. Yet that seems to be what the Administration was referencing in the initial denial notice. (*Compare* AR 757 (services bill from Dr. Clark's office regarding "4/07/15," with the note: "Appt. on 4/7 not kept") *with* AR 127 (initial denial letter, referencing report from Dr. Clark's office "received 04/20/2015").)

The ALJ cites this document only once, noting that "the claimant was a no show for a psychiatric consultative evaluation scheduled for April 7, 2015, and there is no evidence of good cause for the claimant's failure to comply and cooperate in the disability process." (AR 29; *see* AR 757.) The ALJ erred to the extent he relied on this missed appointment as proof that Larsen's symptoms were mild, because Larsen had good cause to skip his second visit with Dr. Clark. In light of the many other times Larsen failed to comply with treatment, however, any such error was harmless. (*See* Section II.C.1.(c) below.)

Thus, Larsen has not shown an agency-wide scheme to defraud him, and none of the evidence rebuts the presumption that the ALJ was unbiased. *See Bayliss*, 427 F.3d at 1215.

## C. Subjective Symptom Testimony

In evaluating the credibility of subjective symptom testimony, "the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (citation omitted). These adverse credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [the] claimant's testimony." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010) (citation omitted). In weighing that testimony, the ALJ may consider all the typical credibility factors, such as prior inconsistent statements, falsehoods,

6

and discrepancies between the claimant's statements and conduct. *Ghanim*, 763 F.3d at 1163.

The ALJ raised five reasons for disbelieving Larsen's symptom testimony. Larsen also takes issue with two grounds the ALJ did not explicitly rely on.

**1.** ***The ALJ's Reasoning***

(a) *Objective Medical Evidence*

The ALJ found that Larsen's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence." (AR 28.) "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted); *see also Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (upholding adverse credibility finding when the ALJ referred to "specific evidence in the record, including numerous medical reports," that contradicted the plaintiff's "subjective complaint"). Larsen does not dispute this legal principle, but instead complains that the ALJ "cherry-picked [the] medical evidence." (ECF No. 20, at 7.)

Contrary to Larsen's characterization, however, the ALJ provided a fair summary of the medical evidence. For instance, the ALJ noted that "very few objective findings . . . support the claimant's allegations of disabling pain due to a mass in his groin" and that "physical examination" of that area "revealed only mild tenderness and no sign of infection." (AR 28.) He referenced multiple objective medical records that supported this observation. (*See, e.g.*, AR 27 (citing AR 449, 607 (hip X-ray normal); AR 433-44 ("mildly tender" groin, no tenderness elsewhere in the region, no infection, no deep-vein thrombosis)).)

The ALJ likewise concluded that the objective medical record undercuts Larsen's purported "classic symptoms of depression" and "anxiety"—a conclusion that Larsen has not challenged. (*See* AR 28.) At the disability hearing, Larsen testified that he had been

7

unable to work because "[e]very day it seemed like I was overcome with emotion and it was so powerful that it actually felt like physical pain." (AR 70.) Yet the ALJ pointed out that Larsen's mental status examinations were "unremarkable," with GAF scores routinely in the "high range," and that his progress notes showed "appropriate" psychiatric findings, as well as "improved mood and improved focus." (*See* AR 29.) The ALJ's supporting citations back up these conclusions, and the record as a whole supports it as well. (*See, e.g.*, AR 471 ("GAF Score: 70-61: Mild symptoms"); AR 677 (normal mental status examination except "appears mildly agitated"); AR 700 ("GAF Score: 60-51: Moderate symptoms"); AR 707 ("GAF Score: 70-61: Mild to moderate symptoms"); AR 713 (normal MSE except "fair" insight, "somewhat flat" affect, and feeling "overwhelmed" and "fatigued"); AR 714 ("GAF= 60"); AR 716 (normal MSE except "melancholy but pleasant" mood and "fleeting thoughts" of suicidal ideation two weeks prior); AR 718 ("GAF Score: 70-61: Mild Symptoms"); AR 719 (normal MSE); AR 721-22 (normal MSE); AR 724 ("GAF Score: 70-61: Mild Symptoms"); AR 726 ("Current GAF: 65"); AR 727 ("Current GAF: 65"); AR 728 ("Current GAF: 65"); AR 730 ("GAF Score: 60-51: Moderate difficulty"); AR 733-34 (normal MSE except "anxious" mood); AR 734 ("GAF Score: 70-61: Mild Symptoms"); AR 737 ("GAF Score: 60-51: Moderate symptoms"); AR 739 ("GAF Score: 70-61: Mild symptoms"); AR 745 ("GAF Score: 60-51: Moderate symptoms"); AR 748 (normal MSE except "anxious and labile" mood); AR 749 ("GAF 60-51: Moderate difficulty").)

According to Larsen, the ALJ cherry-picked evidence by "blatantly disregarding" records from Kaiser Permanente, Scripps, and Tri-City, including "e-mail correspondence" with his "Kaiser medical providers." (ECF No. 20, at 5, 7-8.) In one string citation, Larsen highlights 26 pages in the administrative record that supposedly make the point. (*See id*. at 9.) But the vast majority of these documents merely memorialize his subjective complaints, not any objective medical findings. For example, he points to one page containing an email in which he wrote, "The pain is getting worse . . . I'm getting a stabbing shooting pain [in the] lower left abdomen and the aching in my back and side are more

intense." (*Id.* at 9; AR 453.) That email prompted a call to Larsen, and in the "Telephone Encounter" summary, the doctor noted: "His left inguinal pain is worsening. . . . I think he would benefit from imaging and labs." (AR 453.) None of this amounts to objective clinical test results.

At best, these "blatantly disregarded" documents are a mixed bag. Several of them, in fact, undermine Larsen's claims of disabling pain. (*See, e.g.*, AR 449 ("Left hip: He exhibits normal range of motion, normal strength, no tenderness and no crepitus"); AR 455 ("Physical Exam" showed "no distress" and, at least in the "chest" region, "no tenderness"); AR 469 ("low grade intermittent pelvic pain and testicular pain"); AR 473 (noting that he was "[p]ositive for abdominal pain" but was "in no distress" and had "[n]o red flag symptoms"); AR 778-80 ("mild soreness left inguinal region" and "some posterior [groin] region discomfort," but the ER doctor "suspect[ed] he probably has some underlying anxiety reaction that is worsening his symptoms" because the objective evidence does not support the claimed "8/10" pain severity); *but see* AR 467 (complaining of "no tenderness today," but noting during the physical groin exam that certain parts feel "dilated and bunched up" and that "chronic" achiness there is "worse with pressure to the area").)

Even if this medical evidence "were susceptible to more than one rational interpretation, [only] one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Although not sufficient in itself to justify the ALJ's decision, *see Rollins*, 261 F.3d at 857, the objective medical record was a clear and convincing reason supporting the adverse credibility finding.

(b) *Daily Activities*

According to the ALJ, Larsen's daily activities contradict his complaints of suffering chronic pain so severe that "he engaged in very little physical activity beyond getting up in the morning" and, even as to that, "it was an effort to get up and out of bed." (AR 24, 28, 30.) The ALJ gave a litany of examples: "the capacity to cook his own meals, do laundry, operate a motor vehicle," "handle bills and cash appropriately," "independently maintain

9

self-care including dressing, bathing, feeding and toileting," "go out on his own," "tak[e] care of his mother," "use the computer," "watch[] YouTube," care for and walk his dog, "perform[] yardwork with a weed eater," "perform[] normal chores," "attend medical appointments," and "go to the grocery store." (AR 24, 28, 30.) Larsen does not contest this ground. A claimant "need not vegetate in a dark room" to be eligible for benefits, but these sorts of everyday activities "may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment" and indicate "capacities that are transferable to a work setting." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (citations omitted). So, this uncontested reason is also a clear and convincing basis to reject Larsen's testimony.

(c) *Noncompliance with Treatment Plan*

The ALJ also faulted Larsen for being "noncompliant much of the time" with his prescribed medical care, including taking a months-long hiatus from treatment. (AR 26-27.) Larsen does not argue otherwise, and the ALJ's analysis is well-supported by the record. (*See, e.g.*, AR 699 (noting Larsen's months-long "hiatus" and that he is "noncompliant much of the time"); AR 707 ("noncompliant some of the time"); AR 716 ("compliant most of the time"); AR 736, 738, 744 (same).) In assessing Larsen's credibility, the ALJ properly relied on this "unexplained or inadequately explained failure . . . to follow a prescribed course of treatment." *See Molina*, 674 F.3d at 1113 (citation and quotation marks omitted).

(d) *Lack of Treatment*

Next, the ALJ emphasized that "there are no treating records in evidence for any time during 2016," including the last two-and-a-half months of the closed disability period. (*See* AR 20, 29.) Indeed, the latest treatment record was in July 2015. (*See* AR 769.) Like noncompliance with a medical plan, an ALJ may fault a claimant for an "unexplained or inadequately explained failure to seek treatment." *Molina*, 674 F.3d at 1112 (citation and quotation marks omitted). Larsen does not deny that he failed to seek treatment in 2016,

nor explain that failure, so this was another clear and convincing reason to reject his testimony.

### (e) *Malingering*

The ALJ's final reason was that "Dr. Clark stated that the claimant's poor effort in participation strongly suggests malingering." (AR 30.) Dr. Clark actually found that Larsen "put forth good effort into the evaluation," but that he "was a poor historian" and was "caught in several falsehoods based on clinical records and direct observation." (AR 753-54.) Because of Larsen's "poor credibility," which "strongly suggests malingering," she recommended further testing to "[r]ule out malingering." (AR 755.) She stopped short of finding malingering and even added that if he "is telling the truth about his suicidal ideation" and psychiatric issues, "he would appear to meet the criteria for disability." (*Id.*) Dr. Clark never saw Larsen again, and the next psychiatrist, Dr. Nicholson, concluded that Larsen "appeared to be genuine and truthful." (AR 762.)

Although the record may contain more evidence of malingering,[2] the ALJ only relied on Dr. Clark's comment. That comment was not substantial evidence of malingering, so that was not a clear and convincing reason. On the other hand, the ALJ mentioned that it was only "one factor of many" supporting his adverse credibility finding. (AR 30.) Given the four proper reasons already discussed—including the undisputed points—the ALJ's reliance on any suggestion of malingering was harmless. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (holding that one erroneous reason "amounts to harmless error," when the ALJ "presented four other independent bases for discounting [the claimant's] testimony"); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (holding two invalid reasons for an adverse credibility finding were harmless error in light of the remaining reasoning).

---

[2] For example, Larsen's treating therapist noted that he "embellishes" and "dramatizes" encounters, "casting him[self] a[s] the distraught poor victim." (AR 699.)

11

### 2. *Larsen's Other Objections to the Credibility Finding*

In addition to the stated reasons for the adverse credibility finding, Larsen faults the ALJ for mentioning both his medical marijuana use and the findings of Dr. Taylor-Holmes, an agency consultant. (*See* ECF No. 20, at 4-6.) The problem is that neither of these played any role in the ALJ's credibility assessment. The ALJ's decision, in fact, never mentions Dr. Taylor-Holmes or her writings. A few passing references to state agency "physicians" or "consultants" may have implicitly included Dr. Taylor-Holmes, but never in the context of credibility. (*See* AR 23-24, 30.) Similarly, Larsen complains that the ALJ "described me as 'using cannabis in a quasi-medicinal fashion without sanction from his providers.'" (*Id*. at 4 (citing AR 99).) But the ALJ never wrote that. This quote appears in Dr. Taylor-Holmes's report (*see* AR 99), which is, again, never referenced in the ALJ's decision. The ALJ makes only passing references to Larsen's marijuana use, but never implies that it is a reason to disbelieve his testimony. (*See* AR 27 ("[Larsen] uses THC to get some relief. . . . The claimant complained about Kaiser's policy of not prescribing narcotic pain medication for individuals using marijuana."); *id.* ("Dr. Nicholson indicated that the claimant continued to use marijuana[.]").) As the ALJ did not rely on these grounds, they cannot constitute reversible error.

Because the ALJ's explicit reasons were specific, clear, and convincing—and these additional issues were inconsequential—the adverse credibility finding was proper.

**D.     Obesity**

According to Larsen, the ALJ improperly focused on his obesity—"a condition that I never used in my claim for SSI/SSDI benefits"—to "diminish my more serious health problems . . . and to tarnish my character." (ECF No. 20, at 6-7.) This argument is meritless. Even when a claimant does not "explicitly raise[] her obesity as a disabling factor," but it is "raised implicitly in [claimant's] report of symptoms," the ALJ may be required to include it in the analysis. *Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003). Larsen's reports of disabling pain and immobility, as well as his well-documented height and weight, all raised the specter that his obesity might be disabling. The ALJ properly considered it.

Moreover, the ALJ's obesity findings made it more likely, not less likely, that Larsen would receive disability benefits. The ALJ found that Larsen's obesity was so "severe" that "climbing flights of stairs, working on the floor, stooping, bending, twisting and squatting would not be advisable in a work setting. . . ." (AR 23.) As this issue was "resolved in [the claimant's] favor," there can be no "prejudice[]" and any error is harmless. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

E.     **Side Effects**

Larsen contends that the ALJ "failed to discuss . . . the adverse side [e]ffects that my medication has on me," including "cold sweats" and an inability to "operate heavy machinery" when using "medical cannabis[] or opiate pain medication." (ECF No. 20, at 7.) Yet these side effects appeared nowhere in the record before the ALJ. For instance, in his Adult Function Report, Larsen was asked, "[D]o any of your medicines cause side effects?" He answered, "No." (AR 202.) On that same page, under "SIDE EFFECT(S) YOU HAVE," he wrote "N/A" in all five boxes. (*Id*.) Likewise, during Larsen's testimony, the ALJ asked if his Atarax caused "[a]ny bad side effects," to which Larsen replied, "None that I'm aware of at all." (AR 82.) The other passing mentions of side effects do not imply an inability to work. (*See, e.g.*, AR 230 (mother's third-party function report: "I don't know" of any side effects); AR 457, 701 ("Side Effects: dry mouth"); AR 469, 732 ("no side effects" from Ativan).) Thus, this argument provides no basis for reversal. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir. 2001) (affirming denial of benefits because the "passing mentions of the side effects of [claimant's] medication" revealed "no evidence of side effects severe enough to interfere with [claimant's] ability to work").

F.     **Disabled-Person Parking Placard**

A "reasonable person" must conclude that Larsen "suffer[s] from chronic acute pain," he next argues, because he is a "permanent disable[d] handicapped placard holder" and he "took steps to get my doctor to complete the form." (ECF No. 20, at 8.) The record shows that a doctor "filled out" a "Dmv placard form." (AR 465-66.) But it does not establish what the doctor wrote on that form (supporting or opposing a placard), let alone

the doctor's reasoning. An ALJ may "permissibly reject" a doctor's application "for a disabled parking placard" when it does not "contain any explanation of the bases of [the doctor's] conclusions." *Wilfred-Pickett v. Berryhill*, No. 15-35199, 2017 WL 6397247, at *2 (9th Cir. Dec. 15, 2017) (citation omitted); *see also Papin v. Barnhart*, 221 F. App'x 540, 541 (9th Cir. 2007) ("[A]lthough the treating physician completed a disabled person placard statement in support of [claimant's] request for disabled parking privileges, the ALJ was not required to consider it, . . . because it was conclusory. . . ." (citation omitted)). Because the record does not contain the basis for any doctor's recommendation for a disabled parking plate, the ALJ did not err in failing to consider it.

### G. Vocational Expert's Qualifications

In a frontal attack on the Administration's evidence, Larsen protests that "the expert witness [who] was telephonically involved in the hearing" was unqualified to testify because she "lack[ed] any kind of medical degree." (ECF No. 20, at 13.) Yet the witness in question—the vocational expert—was not there to give medical testimony, but to "translate factual scenarios into realistic job market probabilities." *See Johnson v. Shalala*, 60 F.3d 1428, 1436 (9th Cir. 1995) (alterations and citation omitted). She had a master's degree in rehabilitation counseling from New York University, a certification in that same field, over 25 years of experience in vocational rehabilitation, and 13 years as a vocational expert. (AR 266.) At the hearing, when asked, Larsen's counsel prudently did not object to the witness "testifying as a vocational expert by phone." (AR 85.) Larsen's belated objection now is baseless.

### H. Physical Consultative Examiner

Finally, Larsen argues that the ALJ should have ordered a consultative examination of his physical condition. (ECF No. 20, at 12.) The Administration "has broad latitude in ordering a consultative examination" and is typically required to do so only when "additional evidence needed is not contained in the records of the claimant's medical sources" or there is "ambiguity or insufficiency in the evidence that must be resolved." *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001) (alterations and citations omitted).

Larsen has not identified any such deficiencies. The extensive medical records regarding his physical condition are not ambiguous; he simply appears to disagree with the interpretation of those records by all the doctors who reviewed them. (*See, e.g.*, AR 30 ("State Agency consultants" determined Larsen could perform "light level work").) He offered no countervailing medical opinions that would cast any of this straightforward evidence into doubt, such as a treating doctor's opinion. When there is "a body of largely undisputed evidence" that supports the medical experts' opinions, as here, the ALJ does not "err in declining to order a [further] consultative examination." *Taylor v. Astrue*, 386 F. App'x 629, 633 (9th Cir. 2010).

## III.
## CONCLUSION

The Court recommends that Larsen's summary judgment motion (ECF No. 20) be denied, that defendant's cross-motion for summary judgment (ECF No. 21) be granted, and that the denial of disability benefits be affirmed. The parties have 14 days from service of this report to file any objections to it. *See* 28 U.S.C. § 636(b)(1). A party may respond to any such objection within 14 days of being served with it. *See* Fed. R. Civ. P. 72(b)(2).

Dated: February 5, 2018

Hon. Andrew G. Schopler
United States Magistrate Judge